391, 398 (M.D. Pa. 2013) (finding personal jurisdiction where non-resident defendant's interactive website was used by Pennsylvania residents to place at least 17 orders over a three-year period); *TRE Services, Inc. v. U.S. Bellows, Inc.,* 2012 WL 2872830, *4–5 (W.D. Pa. July 12, 2012) (finding personal jurisdiction based on defendant's commercially interactive website that accepted orders from Pennsylvania); *Gourmet Video, Inc. v. Alpha Blue Archives, Inc.,* 2008 WL 4755350, *3 (D.N.J. Oct. 29, 2008) ("Personal jurisdiction is properly exercised over a defendant using the Internet to conduct business in the forum state."); *L'Athene, Inc. v. EarthSpring LLC,* 570 F. Supp. 588, 593–94 (D. Del. 2008) (defendants purposely availed themselves of doing business in state of Delaware where they operated a website accessible in Delaware, received orders and payments from customers in Delaware, and shipped their products to Delaware). Thus, the Defendants in this case have all offered interactive web sites for viewing, ordering, and paying for the Counterfeit Goods and have purposefully availed themselves of the opportunity to conduct business with Pennsylvania citizens with their respective Merchant Storefronts.

Further there is sufficient evidence to establish the type of "intentional interaction with the forum state" required by the Third Circuit for the exercise of personal jurisdiction. *See Toys "R" Us,* 318 F.3d at 451–52 (requiring evidence that the defendant has "intentionally interact[ed] with the forum state). *See, e.g., Square D.,* 2008 WL 4462298 at *9 n. 10 (concluding that an amount equal to less than 1% of overall sales was sufficient to establish minimum contacts); *Zippo,* 952 F.Supp. at 1127 (exercising personal jurisdiction despite that only 2% of the defendant's customers were Pennsylvania residents); *L'Athene,* 570 F. Supp. 2d at 593–94 (exercising personal jurisdiction despite that sales to the forum state constituted less than 1% of defendants' total annual sales based on units sold). As noted in *Zippo,* "[t]he Supreme

Court has made clear that even a single contact can be sufficient." *Zippo,* 952 F. Supp. at 1127 (citing *McGee v. Int'l Life Ins. Co.,* 355 U.S. 220, 223, 78 S.Ct. 199, 2 L. Ed. 2d 223 (1957)); *see also Square D.,* 2008 WL 4462298 at *9 n. 10 (noting that, while an argument based on a minute number of overall sales might be "valid in the context of general jurisdiction, in the context of specific jurisdiction it is evidence that supports Plaintiff's argument that the Moving Defendants purposefully availed themselves of the laws and privileges of Pennsylvania by selling and shipping products to residents of the Commonwealth.").

Since the Defendants have purposefully availed themselves of the opportunity to conduct business with Pennsylvania citizens through their interactive websites, the Court must next consider whether this litigation "arise[s] out of and relate[s] to" those sales. *D'Jamoos,* 566 F.3d at 102. Here, the lawsuit directly arises out of the Defendants' respective sales of Infringing Products to Pennsylvania residents through their interactive websites. *See, e.g., Willyoung,* 2009 WL 3183061 at *13 ("The second part of our jurisdictional inquiry is also easily satisfied because this litigation arises out of and relates to BGM's use of its web site to conduct internet-based sales of its merchandise to Pennsylvania residents.") (internal quotation marks omitted); *Square D.,* 2008 WL 4462298 at *11 (finding the relatedness requirement satisfied where "at least one" of the products sold to a Pennsylvania resident by the defendant was from the allegedly infringing line of products at issue in the litigation). All of the Infringing Products which are the subject of this lawsuit were sold into Pennsylvania. Therefore, the "arise[s] out of and relate[s] to" test is easily met here.

Finally, the Court must consider whether the exercise of jurisdiction would otherwise comport with "traditional notions of fair play and substantial justice." *O'Connor v Sandy Lane Hotel Co., Ltd,* 496 F.3d 312, 316 (3rd Cir. 2007)(quoting *Int'l Shoe,* 326 U.S. at 316). Because

the existence of minimum contacts makes jurisdiction presumptively constitutional, the defendant at step three of the specific-jurisdiction-inquiry process "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id*. (quoting *Burger King,* 471 U.S. at 477). The burden upon the defendant at this stage of the inquiry is considerable. *See Pennzoil Prods. Co. v. Colelli & Assocs., Inc.,* 149 F.3d 197, 207 (3rd Cir. 1998) (noting that if minimum contacts are present, then jurisdiction will be unreasonable only in "rare cases"); *Grand Entm't Group, Ltd., v. Star Media Sales, Inc.,* 988 F.2d 476, 483 (3rd Cir.1993) ("The burden on a defendant who wishes to show an absence of fairness or lack of substantial justice is heavy."). As the Third Circuit has observed:

> The Supreme Court has identified several factors that courts should consider when balancing jurisdictional reasonableness. Among them are the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate [and international] judicial system's interest in obtaining the most efficient resolution of controversies, and [t]he procedural and substantive interests of other nations.

*O'Connor,* 496 F.3d at 324 (internal quotations omitted).

Here, the Plaintiff's interest in obtaining convenient and effective relief in the forum of its choice and Pennsylvania's interest in protecting its citizens from the sale of infringing goods within its borders are factors that weigh heavily in finding personal jurisdiction of the Defendants. *See Square D*, 2008 WL 4462298 at *12 (concluding that jurisdiction should be exercised in Pennsylvania "because the counterfeit goods in question potentially pose a danger to the public and were sold to residents of this Commonwealth."); *Zippo,* 952 F.Supp. at 1127 (noting Pennsylvania's strong interest in resolving trademark infringement claims implicating its citizens and giving "due regard to the Plaintiff's choice to seek relief in Pennsylvania"). As the court noted in *Zippo,* "[i]f [the defendant] had not wanted to be amenable to jurisdiction in

Pennsylvania, the solution would have been simple—it could have chosen not to sell its [products] to Pennsylvania residents." *Id*. at 1126–27.

Accordingly, Plaintiff respectfully submits that this Court has personal jurisdiction over Defendants in this action.

      **B.    PLAINTIFF IS ENTITLED TO AN *EX PARTE* TEMPORARY RESTRAINING ORDER AND A PRELIMINARY INJUNCTION**

An *ex parte* order is essential in this case to prevent immediate and irreparable injury to Plaintiff. Rule 65(b) of the Federal Rules of Civil Procedure provides, in pertinent part, that a temporary restraining order may be granted without written or oral notice to the opposing party or that party's counsel where "it clearly appears from the specific facts shown by affidavit . . . that immediate and irreparable injury, loss or damage will result to the applicant before the adverse party or that party's attorney can be heard in opposition." Fed. R. Civ. P. 65(b). Further, this court has inherent power to grant an *ex parte* restraining order. *See Link v. Wabush R. R.*, 370 U.S. 626, 630 – 31 (1962) ("Inherent powers are governed by the 'control necessarily vested in courts to manage their own affairs as to achieve the orderly and expeditious disposition of cases.'(citation omitted)"). Indeed, the Supreme Court has indicated that federal courts have broad inherent powers to accomplish justice. *See Chambers v. Nasco, Inc.*, 501 U.S. 32, 44 (1991).

Defendants herein fraudulently promote, advertise, sell, and offer for sale goods infringing Plaintiffs' Mark, Plaintiffs' Works, and/or at least one claim of the '198 Patent via their fully interactive, commercial Internet e-commerce stores using the Seller IDs. Specifically, Defendants wrongfully use infringements of Plaintiffs' Mark, Plaintiffs' Works, and/or at least one claim of the '198 Patent to increase traffic to their illegal operations. By their actions,

Defendants are passing off Defendants' Infringing Products as Plaintiff's genuine products and creating a false association in the minds of consumers between Defendants and Plaintiffs. The entry of a temporary restraining order would serve to immediately stop Defendants from benefiting from their wrongful use of Plaintiffs' intellectual property at issue and preserve the status quo until such time as a hearing can be held. *See Dell Inc. v. BelgiumDomains, LLC*, Case No. 07-22674 2007 WL 6862341, at *2 (S.D Fla. Nov. 21, 2007) (finding *ex parte* relief more compelling where Defendants' scheme "is in electronic form and subject to quick, easy, untraceable destruction by Defendants.")

Absent a temporary restraining order without notice, Defendants can and, based upon Plaintiffs' counsel's past experience, will significantly alter the status quo before the Court can determine the parties' respective rights. In particular, the Seller IDs at issue are under the Defendants' complete control. Thus, Defendants have the ability to modify e-commerce store data and content, redirect consumer traffic to other seller identification names, change payment accounts, and transfer assets. *Ference Dec.*, ¶ 6. Such modifications can happen in a short period of time after Defendants are provided with notice of this action. *Id.* Defendants can also easily electronically transfer and secret the funds sought to be restrained if they obtain advance notice of Plaintiff's Application for a Temporary Restraining Order and thereby thwart the Court's ability to grant meaningful relief and can completely erase the status quo. *Id.* As Defendants engage in illegal infringing activities, Plaintiffs have no reason to believe Defendants will make their assets available for recovery pursuant to an account of profits or will adhere to the authority of this Court any more than they have adhered to the Lanham Act and the Patent Act.

"Courts in other circuits dealing with foreign on-line counterfeiters have not hesitated to exercise [their] authority [to grant an *ex parte* order] in infringement cases in which there is a

danger the defendants will destroy, conceal, or transfer counterfeit goods." *Moose Toys Pty, Ltd. v. Thriftway Hylan Blvd. Drug Corp.*, No. 15- cv-4483-DLI/MDG, 2015 U.S. Dist.. LEXIS 105912, at *8 (E.D.N.Y. Aug. 6, 2015). Moreover, federal courts have long recognized that civil actions against counterfeiters - whose very business is built around the deliberate misappropriation of rights and property belonging to others - present special challenges that justify proceeding on an *ex parte* basis. *See Columbia Pictures Indus., Inc. v. Jasso*, 927 F. Supp. 1075, 1077 (N.D. Ill. 1996) (observing that "proceedings against those who deliberately traffic in infringing merchandise are often useless if notice is given to the infringers"); *Time Warner Entertainment Co., L.P.* v. *Does*, 876 F. Supp. 407, 410-11 (E.D.N.Y. 1994).

This Court should prevent an injustice from occurring by issuing an *ex* parte temporary restraining order which precludes Defendants from continuing to display their infringing content via the Internet e-commerce stores or modifying or deleting any related content or data. Only such an order will prevent ongoing irreparable harm and maintain the status quo. The immediate and irreparable harm to Plaintiff's business and reputation -- as well as to the goodwill associated with Plaintiff's Mark -- in denying its Application for an *ex parte* temporary restraining order, greatly outweighs the harm to Defendants' interests in continuing to offer for sale and sell Infringing Products. Many courts have granted an *ex parte* temporary restraining order in situations where the harm to plaintiffs far outweighed the harm to defendants.[8]

The Third Circuit holds that a district court must evaluate the following four factors in deciding whether preliminary injunctive relief is appropriately entered: (1) the extent to which the moving party will suffer irreparable harm without injunctive relief; (2) the likelihood that the moving party will succeed on the merits; (3) the extent to which the nonmoving party will suffer irreparable

---

[8] *See, supra* fn. 2 (collecting cases granted *ex parte* temporary restraining order in situations where harm to plaintiffs far outweighed harm to defendants.).

harm if the injunction is issued; and (4) the public interest. *AT&T Co. v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994). Courts routinely grant preliminary injunctive relief when a party's trademark rights are threatened by the sale of counterfeit versions of its products based on a trademark holder's inability "to control the quality of the goods manufactured and sold under the holder's trademark." *El Greco Leather Prods. Co. v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir. 1986). As shown below, Plaintiffs readily meet the criteria for obtaining a temporary restraining order and preliminary injunction. *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (quoting *Federal Express Corp. v. Federal Espresso, Inc.*, 201 F.3d 168, 173 (2d Cir. 2000)). The "standards which govern consideration of an application for a temporary restraining order are the same standards as those which govern a preliminary injunction." *Local 1814, Int'l Longshoremen's Ass'n v. N.Y. Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992). *See also Hall v. Johnson*, 599 F.Supp.2d 1, 6 n. 2 (D.D.C. 2009); *accord Sterling Commercial Credit-Michigan, LLC v. Phoenix Industries I, LLC*, 762 F.Supp.2d 8 (D.D.C. 2011); *Coalition for Parity, Inc. v. Sebelius*, 709 F.Supp.2d 6 (D.D.C. 2010). As detailed below, Plaintiff has met the standard for a preliminary injunction, and accordingly, a temporary restraining order should also issue against Defendants.

1. **<u>Plaintiffs Will Suffer Irreparable Harm in The Absence of an Injunction Leaving Them With No Adequate Remedy at Law</u>**

Defendants' infringing activities must be stopped immediately in order to prevent any further harm to Plaintiff. Not only does Plaintiff stand to suffer lost profits as a result of Defendants' competing substandard Infringing Products, but it destroys the inherent value of Plaintiff's Marks, it impairs Plaintiff's reputation for providing quality products, it dilutes Plaintiff's brand and goodwill and it negatively affects Plaintiff's relationships with its current customers and its ability to attract new customers. *See Dertsakyan Dec.,* ¶¶ 29 - 31. While courts

may no longer presume irreparable harm upon a finding of infringement, *Salinger v. Colting,* 607 F.3d 68, 82 (2d Cir. 2010), "[i]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 805 (3d Cir.1998). Lack of control over one's mark "creates the potential for damage to ... reputation[, which] constitutes irreparable injury for the purpose of granting a preliminary injunction in a trademark case." *Opticians Ass'n of Am. v. Indep. Opticians of Am., 920 F.2d 187, 196 (3d Cir.1990)*. Thus, "trademark infringement amounts to irreparable injury as a matter of law." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir.1992); *see also Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 169 (3d Cir.2000) ( "potential damage to ... reputation or goodwill or likely confusion between parties' marks" is irreparable injury). "[O]nce the likelihood of confusion caused by trademark infringement has been established, the inescapable conclusion is that there was also irreparable injury." *Pappan*, 143 F.3d at 805. *See also* U.S. *Polo Ass'n, Inc. v. PRL USA Holdings, Inc.,* 800 F.Supp.2d 515, 540 (S.D.N.Y. 2011); *see also NYPHoldings v. New York Post Pub. Inc.,* 63 F. Supp. 3d 328, 341 (S.D.N.Y. 2014) ("[A]lthough irreparable harm may not be presumed upon a showing of a likelihood of success, irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark . . . Thus, it will often be the case that a party's demonstration of a likelihood of success on a trademark claim will also show a threat of irreparable harm." (citing *eBay, Inc. v. MercExchange, LLC,* 547 U.S. 388, 393 (2006); *Salinger,* 607 F.3d at 80)). *See: Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152, 224 U.S.P.Q. (BNA) 753 (3d Cir. 1984). ("Harm is irreparable when it cannot be compensated adequately in money

damages."). *See also S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir.1992) (Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.)

Moreover, Defendants' infringing activities deny Plaintiff its fundamental right to control the quality of the goods sold under its marks. *See Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 243 (2d Cir. 2009) (affirming district court's grant of preliminary injunction) (quoting *El Greco Leather Products Co. v. Shoe World, Inc.,* 806 F.2d 392, 395 (2d Cir. 1986, *cert. denied,* 484 U.S. 817 (1987) ("[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holder's trademark."). Defendants are offering their substandard Infringing Products, often in wholesale quantities, at significantly below market prices with which Plaintiff cannot compete given the high-quality materials and construction necessary to manufacture the genuine products. *See Erdely Dec.,* ¶¶ 19 - 23 and *Groupe SEB USA v. Euro-Pro Operating LLC*, 774 F.3d 192 (3d Cir. 2014) (holding that irreparable harm is caused to a trademark owner who cannot control the quality of their products because "a higher incidence of substantial sales of counterfeit goods, which are invariably non-conforming and inferior" would "harm [Plaintiffs'] reputation and diminish the value of its trademark."); *see also Mint, Inc. v. Iddi Amad*, No. 10-cv-9395-SAS, 2011 U.S. Dist.. LEXIS 49813, at *9 , n.23 (S.D.N.Y. May 9, 2011) ("the loss of pricing power resulting from the sale of inexpensive 'knock-offs' is, by its very nature, irreparable") (citing *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1362 (Fed. Cir. 2008) (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,* 237 F.3d 1359, 1368 (Fed. Cir. 2001) (likelihood of price erosion and loss of market position are evidence of irreparable harm); *Polymer Techs., Inc. v.*