IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GORGE DESIGNS, LLC, *et al*., | | Civil Action No. |
| Plaintiffs, | | 20-1384 |
| v. | | (Judge Stickman) |
| SYARME, *et al*., | | |
| Defendants. | | |

**OPPOSITION TO DEFENDANT MERCADOMAGICO'S
MOTION FOR ATTORNEY'S FEES AND COSTS (ECF No. 42)**

## I.   INTRODUCTION

There has never been any doubt that Defendant MercadoMagico, like the other Defendants in this case, did exactly what Plaintiffs allege Defendant MercadoMagico did.  The evidence submitted by Plaintiffs at the time this lawsuit was filed demonstrated that 1) Defendant MercadoMagico used fifteen (15) of Plaintiffs' photographs to advertise and offer for sale a cheap knock-off of Plaintiffs' ULTIMATE GROUND ANCHOR product, thereby creating a likelihood that consumers would think Defendant MercadoMagico's cheap knock-off product was Plaintiffs' ULTIMATE GROUND ANCHOR product, and 2) the cheap knock-off offered for sale by Defendant MercadoMagico infringed Plaintiffs' patent.  As former U.S. President John Adams stated so aptly, "[f]acts are stubborn things; and whatever may be our wishes, our inclinations, or the dictates of our passions, they cannot alter the state of facts and evidence."[1]

---

[1]   "Adams' Argument for the Defense: 3–4 December 1770," *Founders Online,* National Archives, https://founders.archives.gov/documents/Adams/05-03-02-0001-0004-0016 (last visited Nov. 4, 2020).

Building upon the evidence previously submitted and reviewed by the Court, Plaintiffs also submit herewith the Declaration of Kirby Erdely and the Declaration of Nicholas Mesiti.("Mesiti Dec."). Mr. Erderly's Declaration includes a side-by-side comparison of each of the photographs used by Defendant MercadoMagico and Plaintiffs' photographs.  As explained in Mr. Erdely's Declaration, he personally took four of the photographs used by Defendant MercadoMagico and one of the photographs was taken by Mr. Erderly's mother Lynn Early (of her dog Suki).  Defendant MercadoMagico does not offer any explanation as to how it came to use any of these fifteen (15) photographs, which appear on various websites (i.e., orangescrew.com, amazon.com, kickstarter.com, and include frame grabs from Plaintiffs' videos posted on YouTube.com).  Mr. Erdely's Declaration also discusses how Defendant MercadoMagico's use of these fifteen (15) photographs created actual confusion as Mr. Erdely learned about Defendant MercadoMagico's unlawful activities when he received a complaint about a low quality, flimsy ground anchor from someone who had actually purchased the product they were complaining about from Defendant MercadoMagico.

Mr. Mesiti's Declaration confirms the product offered for sale and sold by Defendant MercadoMagico infringes Plaintiffs' patent, and responds to the twisted claim construction proffered by Defendant MercadoMagico that the product offered for sale and sold by Defendant MercadoMagico includes a single thread, not the "plurality of threads" required by the patent claims.  (*See Mesiti Dec*., ¶¶ 21 – 29) As discussed by Mr. Mesiti, the Wikipedia articles relied upon by Defendant MercadoMagico do not even support Defendant MercadoMagico's position. (Id. at ¶¶ 26 - 28) As Mr. Mesiti's Declaration points out, Defendant MercadoMagico's own evidence defines the "pitch" of a screw as the distance between adjacent threads and Defendant MercadoMagico's own evidence recognizes the pitch is measured in "threads per inch." (*See id*.)

Rather than atone for its conduct, Defendant MercadoMagico misrepresents the facts and the law to ask the Court to impose punishing attorney's fees and costs (well over $40,000) on this small family business for the privilege of having been dismissed from this case.[2] Surprisingly, counsel for Defendant MercadoMagico did not even attempt to make contact with Plaintiffs' counsel before beginning to incur fees, despite that its own evidence shows Defendant MercadoMagico had notice of this lawsuit the morning of September 23, 2020 (twelve days prior to the preliminary injunction hearing).  [ECF No. 44-1]  Plaintiffs' counsel initiated all the contacts in this case leading up to the hearing.  During telephone calls with Defendant MercadoMagico's counsel on October 2, 3, and 4, all initiated by Plaintiff's counsel, Defendant's counsel refused to discuss anything other than a demand to be dismissed from the case and for Plaintiffs to pay all costs.  Despite over 2,500 online counterfeiting cases that have been filed in this Court and other jurisdictions – and which have been brought and litigated in the same way as this case – Defendant MercadoMagico has not cited one case in which attorney fees have been awarded to a defendant, regardless where the defendant is located.  Simply stated, Defendant MercadoMagico has not shown – and cannot show – that Plaintiffs acted in bad faith in bringing this lawsuit against Defendant MercadoMagico.  Defendant MercadoMagico's motion for attorney's fees and costs should be denied.

## II.  STATEMENT OF FACTS

In a common counterfeiting scenario, websites contain photos of the real product, fake reviews of the counterfeit product, and other such disinformation designed to mislead or fool the

---

[2]   On October 4, 2020, Plaintiffs and Plaintiffs' Counsel elected to voluntary dismiss the Defendant under Rule 41 from the lawsuit to permit the Court to smoothly take up the Show Cause Hearing.  The remaining Defendants neither appeared, objected to or opposed the standard Preliminary Injunction Order sought by the Plaintiffs on October 4, 2020.  That Order was entered by the Court and to date not a single Defendant has moved to modify the Order or otherwise oppose it.  The voluntary dismissal was without prejudice and Plaintiffs are free to again bring the same claims

consumer into believing the legitimacy of the product.  This is exactly what Defendant

MercadoMagico did – used fifteen (15) of Plaintiff's pictures to fool consumers into believing

they were offering Plaintiffs' genuine product for sale.  As discussed below, the U.S.

Government recognizes "[t]he proliferation of such disinformation is the hallmark of the

successful online counterfeiter.  Such deception not only provides counterfeiters with an

enormous competitive advantage over their brick-and-mortar counterparts; legitimate sellers on

the internet are harmed as well."  "Combating Trafficking in Counterfeit and Pirated Goods:

Report to the President of the United States."  (*See* Declaration of Stanley D. Ference III

(*Ference Dec II*) filed herewith, Ex. 11, p. 22)

It is well recognized that such counterfeiting causes irreparable harm to small business like

Plaintiffs that have a limited product line.  As discussed below, an example of such a business is

Forearm Forklift  (*Ference Dec.*, Ex. 13)  As noted in the CNBC article entitled "How Amazon

put this man's business on the brink of collapse," "Forearm Forklift is hanging on by a thread.

The company is down to 21 full-time employees from 52 at its peak and recorded less than $500

in profit last year.  Annual revenue in 2008 topped $4 million and has since plunged 30 percent.

**Retailers stopped placing orders because they were finding what appeared to be the same**

**thing online for much cheaper.**"  (emphasis added)  As noted in the New York Times, the

business of one company – Brush Hero – "could not stand the effect of counterfeits and would be

laying off most of its staff."  (*Ference Dec II.*, Ex. 7)

### A.    Online Counterfeiting Jeopardizes Plaintiffs' Business

Gorge Designs, LLC and the Kirby Erdely (hereinafter Plaintiffs) founded their small

family business based upon Kirby's now deceased father-in-law's ingenious patented

ULTIMATE GROUND ANCHOR device.  (Declaration of Kirby Erdely in Support of

Plaintiff's *Ex Parte* Application, ¶¶ 5 – 7, ECF No. 8).  The business was launched through a

Kickstarter campaign in 2015.  Through good old American hard work and determination, the

business began to support Kirby's young family.  Almost immediately, the copycats and

infringers and counterfeiters set to work trying to steal business from Plaintiffs.  (*Id.* at ¶ 19).

Using Plaintiffs' own photographs, these nefarious online merchants have confused, passed off

their cheap copies, and unfairly competed with Plaintiffs, threatening the very existence of the

Plaintiffs' business. (*See Id.* at ¶¶ 19 - 26).  Looking to save their family business, Plaintiffs

turned to Plaintiffs' Counsel to bring a lawsuit against all the sellers of the infringing products.

(*See Id.* at ¶ 20).

### B. The Online Counterfeiting Problem

In its 2018 10-K filed with the with Securities and Exchange Commission, Amazon.com,

Inc. stated for the first time that "We also may be unable to prevent sellers in our stores or

through other stores selling unlawful, counterfeit, pirated, or stolen goods, selling goods in an

unlawful or unethical manner, violating the proprietary rights of others, or otherwise violating

our policies..." (*Ference Dec.*, Ex. 1)  In its 2018 Annual Report, Amazon disclosed that the

share of sales by third party sellers has grown from 3% to 58%.  (*Id.*)  These disclosures began to

focus attention on the perils of online market places.

In August 2019, the <u>Wall Street Journal</u> published an article entitled "Amazon Has Ceded

Control of Its Site.  The Result: Thousands of Banned, Unsafe or Mislabeled Products."

(*Ference Dec.*, Ex. 2)  This was followed by a November article entitled "Amazon's Heavy

Recruitment of Chinese Sellers Puts Consumers at Risk."  (*Ference Dec.*, Ex. 3) ("Amazon's

China business is bigger than ever.  That is because it has aggressively recruited Chinese

manufacturers and merchants to sell to consumers outside the country.  And these sellers, in turn,

represent a high proportion of problem listings found on the site…")  Later that month, the *Washington Post* published an article entitled "How Amazon's quest for more, cheaper products has resulted in a flea market of fakes."  (*Ference Dec.*, Ex. 4) ("The continued abundance of counterfeit goods on the site is the result of Amazon's decisions to prioritize a broad selection of products and cheaper prices over the deployment of aggressive technologies and policies that could further stem the problem…" and "[l]etting so many sellers in with few limitations has also created a marketplace for fakes that were more often found on street corners or flea markets").  Fox Business reports that while eBay's counterfeit problem appears to be more serious, Amazon is significantly more popular in terms of market size and therefore has come under heavier scrutiny than other sites.  (*Ference Dec*, Ex. 5)

In December 2019 CNN published an article entitled "Fake and dangerous kids products are turning up for sale on Amazon."  (*Ference Dec.,* Ex. 6)  As noted in the article, "businesses said Amazon put the onus on them to report suspicious listings and that this often amounted to a game of "whack-a-mole," in which new listing appeared almost as soon as flagged ones were taken down."  The article continues, "Under current US case law, Amazon is not liable when third-party products sold on its site directly infringe on intellectual property or have safety defects.  The liability lies with the third-party sellers.  This is fundamentally different from how the law treats brick-and-mortar retailers like Target (TGT) or Walmart (WMT) or even your corner grocery.  If you find a product at a physical store that infringes on your trademark, or you buy something defective there, you can sue the store even though they didn't make the product."

In 2020, the New York Times published an article entitled "Welcome to the Era of Fake Products."  (*Ference Dec.*, Ex. 7)  The article opens with the following:

> Imagine walking into your local grocery store and seeing two virtually identical
> cartons of milk right next to each other. The only discernible difference—and it's

barely discernible—is that there's a tiny tag on one carton saying the milk is sold by a third-party seller. Oh, and it might have rat poop in it.

This scenario isn't all that far from what's happening in e-commerce retailers' massive, hard-to-police markets of third-party sellers.

The rise of counterfeit goods and other phony products sold on the Internet has been swift—and it has largely gone unnoticed by many shoppers. But make no mistake: The problem is extensive. Most people don't realize this, but the majority of listings on Amazon aren't actually for items sold by Amazon—they're run by third-party sellers. And even though many, many third-party sellers are upstanding merchants, an awful lot of them are peddling fakes.

As noted in the article, "Because there are rarely consequences for selling fakes, beyond a seller disappearing from a site, the seller can just reestablish its presence to continue to move its inventory. 'Once they're off, they come back under a different brand and name.'" This article also noted how the third-party seller system is a boon to counterfeiters:

Counterfeits have always been an issue. But the Internet has exacerbated the problem.

In the brick-and-mortar days, a counterfeit product might have a harder time getting onto the shelves of a legitimate business, since it would be in a retailer's best interest to vet the validity and safety of products the retailer might be liable for selling to a customer. Business owners were gatekeepers, and counterfeits were largely relegated to back alleys, figuratively and literally.

Things are different online. Smaller vendors who peddle counterfeits, particularly pseudonymous third-party sellers on e-commerce platforms with broad reach and trust, now have access to millions of customers they never had when they were lurking in downtown alleys and flea markets.

* * *

Making things particularly tricky is the fact that a single e-commerce product page may include offerings from the manufacturer as well as from many third-party sellers, some honest and some not so honest. On an ecommerce site, it's as though those back-alley and swap-meet sellers have gotten to put their wares inside the store, on the same shelf as the real goods. And product placement relies on an algorithm that can push the cheapest version to the front of the shelf.

Also in 2020 the Canadian Broadcasting Company published an article entitled "We bought dozens of products from AliExpress, Amazon, eBay, Walmart and Wish.  Over half were suspect fakes: Why you might want to think twice before shopping online."  (*Ference Dec.*, Ex. 8)  As noted in this article, one counterfeit lipstick had over 751 times the amount of lead Health Canada considers acceptable in cosmetics.

The current Administration has taken note of the counterfeiting on online marketplaces.  The *Fiscal Year 2018 Seizure Statistics* prepared by the U.S. Customs and Border Protection Office of Trade show that 87% of the seizures made of counterfeit goods originate in China (including Hong Kong).  (*Ference Dec*, Ex. 9)  Plaintiffs believe all of Defendants sell products that are manufactured in China.  Peter Navarro, director of the White House Office of Trade and Manufacturing Policy, has said that "for all practical purposes, these e-commerce hubs are basically laundries for counterfeiting  and that "the administration also plans to target people offshore who 'can't be touched now.'" (*Ference Dec.,* Ex. 10)

On January 24, 2020, the Department of Homeland Security released a report entitled "Combating Trafficking in Counterfeit and Pirated Goods : Report to the President of the United States."  (*Ference Dec*, Ex. 11)   Section 5 of the Report is entitled "How E-Commerce Facilitates Counterfeit Trafficking" and begins:

> While e-commerce has supported the launch of thousands of legitimate businesses, e-commerce platforms, third-party marketplaces, and their supporting intermediaries have also served as powerful stimulants for the trafficking of counterfeit and pirated goods. The central economic driver of such trafficking is this basic reality: **Selling counterfeit and pirated goods through e-commerce platforms and related online third-party marketplaces is a highly profitable venture.**
>
> For counterfeiters, production costs are low, millions of potential customers are available online, transactions are convenient, and listing goods on well-known platforms provides an air of legitimacy. When sellers of illicit goods are in another country, they are also exposed to relatively little risk of criminal

prosecution or civil liability under current law enforcement and regulatory practices. It is critical that immediate action be taken to protect American consumers and other stakeholders against the harm and losses inflicted by counterfeiters.

(p. 20) (emphasis added)

In discussing third-party marketplaces and counterfeiters (p. 22), the report states:

A counterfeiter seeking to distribute fake products will typically set up one or more accounts on third-party marketplaces, and these accounts can often be set up quickly and without much sophistication or many specialized skills. Under such circumstances, it is axiomatic that online retailers face much lower overhead costs than traditional brick-and-mortar sellers. There is no need to rent retail space or to hire in-person, customer-facing staff.

**In a common scenario, third-party marketplace websites contain photos of the real product, fake reviews of the counterfeit product, and other such disinformation designed to mislead or fool the consumer into believing the legitimacy of the product.** The proliferation of such disinformation is the hallmark of the successful online counterfeiter. Such deception not only provides counterfeiters with an enormous competitive advantage over their brick-and-mortar counterparts; legitimate sellers on the internet are harmed as well.

In some cases, counterfeiters hedge against the risk of being caught and their websites taken down from an e-commerce platform by preemptively establishing multiple virtual store-fronts. A key underlying problem here is that on at least some e-commerce platforms, little identifying information is necessary for a counterfeiter to begin selling. In the absence of full transparency, counterfeiters can quickly and easily move to a new virtual store if their original third-party marketplace is taken down

(emphasis added)

In discussing warehouses, fulfillment centers and counterfeit trafficking (p. 24), the Report

states:

Certain e-commerce platforms have adopted a business model that relies on North American warehouses to provide space for foreign-made goods, followed by one-at-a-time order fulfillment, at which point the goods are individually packed and shipped to U.S. consumers on much shorter delivery timelines.

\* \* \* \*

In situations where the fulfillment center is outside the U.S. Customs area, this model provides the opportunity to use ocean container shipping as the primary

> mode of transit for the shipment, which keeps overall shipping costs relatively
> low as ocean cargo is much cheaper than air delivery. It is in part because of these
> incentives that these fulfillment centers have emerged as an important element of
> the supply chains for many counterfeit traffickers.

This language is referring specifically to the Fulfilled by Amazon (FBA) model that underlies

Amazon Prime, where Amazon is responsible for the quick (mostly overnight) delivery of goods.

In April 2020, the Office of the United States Trade Representative released the 2019

Special 301 Report (*Ference Dec.*, Ex. 12) which again included China on the Priority Watch

List.  Under the heading of "Manufacturing, Domestic Sale, and Export of Counterfeit Goods,"

(p. 42), the Report states:

> China continued to be the world's leading source of counterfeit goods, reflecting
> its failure to take decisive action to curb the widespread manufacture, domestic
> sale, and export of counterfeit goods. According to a 2019 Organisation for
> Economic Co-operation and Development (OECD) report, China together with
> Hong Kong, through which Chinese merchandise often transships, continued to
> account for over 80 percent of seizures of counterfeit and pirated goods
> worldwide.  Applying a different methodology, another analysis from the 2019
> OECD report analyzed 2016 data and estimated that China and Hong Kong were
> the source of $322 billion in fake exports, around 63.4 percent of the global total.
> This massive problem impacts not only the interests of IP right holders, but also
> poses health and safety risks.

(footnotes omitted)  The Report continued that "OECD reports have noted that the growth of

small parcels containing counterfeit and pirated goods reflected the move the offline to online

sales, and China together with Hong Kong have been the leading source of seized counterfeit

goods shipped by mail or express couriers."  (p. 43, footnotes omitted)

**C. The Harm Suffered by Legitimate Sellers Like Plaintiffs is Existential**

The Introduction to the "Combating Trafficking in Counterfeit and Pirated Goods"

Report (pp. 7-10) (*Ference Dec.,* Ex. 11) begins by stating "E-commerce platforms represent

ideal storefronts for counterfeits…and provide powerful platform[s] for counterfeiters and pirates to engage large number of potential consumers."  The Report continues:

> The rapid growth of e-commerce platforms, further catalyzed by third-party online marketplaces connected to the platforms, has revolutionized the way products are bought and sold. "Online third-party marketplace" means any web-based platform that includes features primarily designed for arranging the sale, purchase, payment, or shipping of goods, or that enables sellers not directly affiliated with an operator of such platforms to sell physical goods to consumers located in the United States.
>
>         * * * *
>
> While the expansion of e-commerce has led to greater trade facilitation, its overall growth— especially the growth of certain related business models—has facilitated online trafficking in counterfeit and pirated goods. American consumers shopping on e-commerce platforms and online third-party marketplaces now face a significant risk of purchasing counterfeit or pirated goods. This risk continues to rise despite current efforts across e-commerce supply chains to reduce such trafficking.
>
> The rise in consumer use of third-party marketplaces significantly increases the risks and uncertainty for U.S. producers when creating new products. **It is no longer enough for a small business to develop a product with significant local consumer demand and then use that revenue to grow the business regionally, nationally, and internationally with the brand protection efforts expanding in step. Instead, with the international scope of e-commerce platforms, once a small business exposes itself to the benefits of placing products online — which creates a geographic scope far greater than its more limited brand protection efforts can handle — it begins to face increased foreign infringement threat.**
>
> Moreover, as costs to enter the online market have come down, such market entry is happening earlier and earlier in the product cycle, further enhancing risk. If a new product is a success, counterfeiters will attempt, often immediately, to outcompete the original seller with lower-cost counterfeit and pirated versions while avoiding the initial investment into research and design.
>
> In other words, on these platforms, the counterfeit and pirated goods compete unfairly and fraudulently against the genuine items. While counterfeit and pirated goods have been sold for years on street corners, alleys, and from the trunks of cars, these illicit goods are now marketed to consumers in their homes through increasingly mainstream e-commerce platforms and third party online marketplaces that convey an air of legitimacy.

(emphasis added)

As noted under "Key Drivers of Counterfeiting and Piracy in E-Commerce" (pp. 10-11):

Historically, many counterfeits were distributed through swap meets and individual sellers located on street corners. Today, counterfeits are being trafficked through vast e-commerce supply chains in concert with marketing, sales, and distribution networks. The ability of e-commerce platforms to aggregate information and reduce transportation and search costs for consumers provides a big advantage over brick-and-mortar retailers. Because of this, **sellers on digital platforms have consumer visibility well beyond the seller's natural geographical sales area.**

Selling counterfeit and pirated goods through e-commerce is a highly profitable activity: production costs are low, **millions of potential customers are available online**, transactions are convenient, and listing on well-branded e-commerce platforms provides an air of legitimacy.

**When sellers of illicit goods are in another country, they are largely outside the jurisdiction for criminal prosecution or civil liability from U.S. law enforcement and private parties.**

\* \* \* \*

Third-party online marketplaces can quickly and easily establish attractive "store-fronts" to compete with legitimate businesses. On some platforms, little identifying information is necessary to begin selling.

A counterfeiter seeking to distribute fake products will typically set up one or more accounts on online third-party marketplaces. **The ability to rapidly proliferate third-party online marketplaces greatly complicates enforcement efforts, especially for intellectual property rights holders. Rapid proliferation also allows counterfeiters to hop from one profile to the next even if the original site is taken down or blocked. On these sites, online counterfeiters can misrepresent products by posting pictures of authentic goods while simultaneously selling and shipping counterfeit versions.**

Counterfeiters have taken full advantage of the aura of authenticity and trust that online platforms provide. While e-commerce has supported the launch of thousands of legitimate businesses, their models have also enabled counterfeiters to easily establish attractive "store-fronts" to compete with legitimate businesses.

(emphasis added)

As recognized by this Report, online counterfeiting is an existential threat to small business in the United States, particularly to startup companies with a limited product line.  An example

of such a business is Forearm Forklift (*Ference Dec.*, Ex. 13)  As noted in the CNBC article

entitled "How Amazon put this man's business on the brink of collapse," "Forearm Forklift is

hanging on by a thread.  The company is down to 21 full-time employees from 52 at its peak and

recorded less than $500 in profit last year.  Annual revenue in 2008 topped $4 million and has

since plunged 30 percent.  **Retailers stopped placing orders because they were finding what**

**appeared to be the same thing online for much cheaper.**"  (emphasis added)  As noted in the

New York Times, the business of one company – Brush Hero – "could not stand the effect of

counterfeits and would be laying off most of its staff." (*Ference Dec II.*, Ex. 7)

### D. Defendant MercadoMagico Chose to Incur Its Attorney's Fees and Has Not Complied with Local Rules or Federal Rule Civ. P. 54

The Temporary Restraining Order was entered on September 21, 2020, and set a hearing

date for October 5, 2020.  On September 22, 2020, Plaintiffs' counsel provided a copy of the

Order to PayPal.  Defendant MercadoMagico's own evidence (*Peterson Dec.*, Exhibit 1 [ECF

No. 44-1]) clearly shows that it had notice of this lawsuit on the morning of September 23, 2020

– the date that PayPal notified Defendant of the lawsuit, Court, docket number, and Plaintiffs'

counsel and contact information.  [ECF No. 44-1].  Prior to filing its first filing on October 2,

2020, Defendant MercadoMagico and its counsel Andrew Oliver did not contact Plaintiffs'

counsel, nor has Defendant MercadoMagico offered any explanation for its failure to contact

Plaintiffs' counsel over the nine (9) days after receiving notice of this lawsuit and making its first

filing.  (*See* Declaration of Brian Samuel Malkin (*Malkin Dec II*), filed herewith at ¶ 22)

Plaintiffs' counsel initiated all the contacts in this case leading up to the show cause hearing.

(*See Id.* at ¶ 22)  During telephone calls with Defendant's counsel on October 2, 3, and 4, all

initiated by Plaintiff's counsel, Defendant's counsel refused to discuss anything other than a

demand to be dismissed from the case and for Plaintiffs to pay all costs.  (*Id.*)  Rather than reach

out to Plaintiffs' counsel over a nine (9) day period, Defendant MercadoMagico chose to incur its attorney's fees and create an "emergency" prior to the hearing.

Defendant MercadoMagico has now twice ignored the Court's meet and confer requirements[3], and has also disregarded the requirements of Federal Rule Civ. P. 54. Contrary to the Defendant's assertion, the 14-day period under Rule 54 began running on October 4, 2020. ("the motion [for attorney's fees] must filed no later than 14 days after the entry of the judgment"). F.R. Civ. P. 54 (d)(2)(B)(i). The time for filing the Defendant's Motion expired on October 18, 2020, not October 19 as it alleges, and as such, a motion under Rule 54 is not timely.

Ignoring these rules and the legal authorities controlling such motions, Defendant filed multiple sets of motions accusing Plaintiffs' counsel of any number of acts of unfairness and wrongdoing (which it did not do) and essentially sullying their good names and reputation for doing good work for their small business clients. In doing so, the Defendant has failed to exercise the level of civility and professional courtesy that this district has come to expect from its bar members. As demonstrated below, the Defendant's motion is not legally supportable and should be denied.

### III. ARGUMENT

Defendant MercadoMagico's motion for attorney's fees and costs should be denied. In issuing the Temporary Restraining Order, the Court correctly found the evidence submitted by Plaintiffs showed Plaintiffs were entitled to the Temporary Restraining Order, *inter alia*, because Plaintiffs were likely to prevail on their claims against Defendant MercadoMagico. This case was properly brought before this Court and notice was properly provided to the Defendant MercadoMagico. As per the Temporary Restraining Order, all of the Financial Institutions and

---

[3]   *See* the Honorable William S. Stickman IV Practice and Procedure, p. 1. (updated February 21, 2020) (requiring that all civil motions affirmatively state whether the motion has been discussed with all parties).

Third Party Service Providers were served with the Temporary Restraining Order.  Once they all confirmed that the restraints had been placed and provided the necessary contact information for each Defendant, the Defendants were served with notice of the lawsuit and the show cause hearing.  PayPal provided Defendant MercadoMagico with notice of this lawsuit on September 23, 2020, twelve (12) days before the hearing in this case on October 5, 2020.  (ECF No. 44-1)  Clearly Defendant MercadoMagico received this notice because they provided it to the Court in their own evidence.

In over 2,500 factually similar online counterfeiting cases, Courts have consistently found personal jurisdiction over defendants like Defendant MercadoMagico, and rejected arguments raised by defendants challenging venue and joinder of the defendants.  Furthermore, there is no basis that supports an award of attorney's fees and costs to Defendant MercadoMagico.  Having been voluntarily dismissed, former Defendant MercadoMagico is not a prevailing party.  Defendant MercadoMagico has not shown – and cannot show – that Plaintiffs acted in bad faith in bringing this lawsuit against Defendant MercadoMagico.  Although other firms have filed over 2,500 factually similar online counterfeiting cases –which have been brought and litigated in the same way as this case for nearly a decade – Defendant MercadoMagico has failed to identify a single case in which attorney fees have been awarded to a defendant.  *See Ference Dec. II* at ¶ 17 and Ex. 15.

### A.  The Court Correctly Found Plaintiffs Were Entitled to a Temporary Restraining Order

The Court correctly found the evidence submitted by Plaintiffs at the time of filing established that Plaintiffs were likely to prevail against MercadoMagico on all counts, including the Section 43(a) claims and the patent infringement claim, and that Plaintiffs had established the required irreparable harm.

After a thorough investigation spanning many months, Plaintiffs confirmed that all of the Defendants, including Defendant MercadoMagico, were either unfairly competing under Section 43 (a) and/or infringing at least one claim of the Plaintiffs' Patent.  Contrary to Defendants' empty assertions, there is no question that Plaintiffs' had a good faith basis for bringing this lawsuit against all the Defendants including Defendant MercadoMagico and for suspecting that the Defendants were coordinating, communicating and cooperating with each other.  Plaintiff Kirby Erdely actually identified MercadoMagico as offering and selling fake infringing products. *See* Declaration of Kirby Erdely (*Erdely Dec II.*), filed herewith, ¶¶ 4 – 8.

Plaintiffs first became aware of the Defendant's infringing products when a customer contacted them complaining about what they thought was a faulty flimsy ground anchor made by Plaintiffs'.  See *Erdely Dec II* at ¶¶ 4 – 8.  Plaintiffs investigated and determined that it was sold to the complaining customer by Defendant MercadoMagico and was a cheap infringing copy that was passed off using Plaintiffs' own photographs.  *See id*.  The Complaint against Defendant MercadoMagico was based on these legal claims and sought remedies only under these claims.[4] Here, Defendant, a non-party, now attempts to litigate the entire case in its papers to become a "prevailing party" so it might seek attorney's fees and the like.  Indeed, Defendant, without a single supporting case in this district or the Third Circuit, is asking this Honorable Court to be the first in the Western District to provide the extraordinary relief it now seeks, endorse the

---

[4]    In its motion, Defendant outlines additional legal claims that Plaintiffs did not bring. Defendant even discusses non-existent claims for Copyright.  Plaintiffs brought a passing off claim under Section 43(a) of the Lanham Act as Defendants used photographs of Plaintiffs to pass off Defendant's infringing products, there are no legal claims nor are damages (statutory or otherwise) sought for copyright, nor was Defendant required to defend against such claims.  Defendant also gripes about the Plaintiffs use of the word "counterfeiting" and believes it improper. However, the U.S. Government lumps all of the infringing and illegal knock-off activity into the collective term "counterfeiting". *See Ference Dec. II* and exhibits attached thereto. Also, the Plaintiffs did not allege any federal counterfeiting or invoke the Lanham Act section or damages for the same. The use of the term in Plaintiffs' Complaint is of no moment in this case.

Defendant's wrongdoing, chill Plaintiffs future efforts to protect its business, and punish the Plaintiffs for bringing their well-pleaded Complaint and supportive papers to the Court.

### 1. The Evidence Shows Plaintiffs Were Likely to Prevail on Their Section 43(a) Claims

In the Declaration of Taylor Ray (ECF No. 12, filed in support of the Temporary Restraining Order), Plaintiffs provided screenshots of Defendant's online store and infringing listing. Plaintiffs confirmed that Defendant used 15 of Plaintiffs photographs available either through Plaintiffs' websites or Amazon Storefront. *Erdely Dec. II*, ¶ 7. Four of these photographs were taken personally by Kirby Erdely and one was taken by his mother Lynne Early. *See id* at ¶¶ 19 – 31. Each of the photographs used by Defendant was an unauthorized copy or digitally altered copy of Plaintiffs' photographs. The use of Plaintiffs' photographs for passing off is the first of Plaintiffs' two unfair competition claims and demonstrates a good faith basis for bringing the unfair competition claims in this case.[5]

### 2. The Evidence Shows Plaintiffs Were Likely to Prevail on Their Patent Infringement Claim

In support of the Temporary Restraining Order, Plaintiffs offered the Declaration of Stanley D Ference III (*Ference Dec.*) who offered evidence by way of a claim chart that each of the Defendants' products, including Defendant MercadoMagico's product, infringed on at least one claim of the Plaintiffs' Patent. (ECF No. 6 – 1). That evidence, alone, provides a good faith basis for filing the lawsuit for patent infringement against the Defendants.

---

[5]   Contrary to Defendant's assertions of "extortive settlement tactics" in its motion, this district does not take such unfair competition lightly. The use of another plaintiff's photographs to sell knock offs into this district has resulted in final judgments awarded of $2,000,000.00 or more for disgorgement of profits under Section 43 (a) unfair competition claims. *See Doggie Dental, Inc. v. Anywill*, No. 19-cv-682 (W.D. Pa., August 14, 2020) [DE 91], and related cases (Hornak, C.J.) It follows that settling such cases is more desirable than letting them go to judgment.

After litigation was commenced, Defendant MercadoMagico offered a separate opinion from its legal counsel indicating that its product does not infringe.  Plaintiffs then secured an opinion from a patent expert, Nicholas Mesiti, Esquire, who has opined based upon the initially filed evidence that the Defendant's product is infringing. (*See* Declaration of Nicholas Mesiti, Esquire in Opposition to Motion for Attorney's Fees and Costs ("*Mesiti Dec.*"), ¶ 7). Specifically, Mr. Mesiti opines that (1) the Defendant's offering for sale of its product constitutes patent infringement (*Id.* at ¶ 6). Mr. Mesiti declares that in reaching his expert opinion, he reviewed the '198 Patent, and the prosecution history thereof and the references and prior art cited therein; the Accused Product offerings as shown in Exhibit A of the Kirby Dec., filed herewith; and Defendant's arguments set forth in its Memorandum of Law in Support of its Motion for Attorney's Fees and Costs. (*Id.*) Based upon Mr. Mesiti's review of the evidence that Plaintiffs filed at the time they filed their Complaint and Motion for Temporary Restraining Order, the Plaintiffs had a good faith basis to bring the patent infringement claim against the Defendant MercadoMagico and Defendant has not proven otherwise.

### 3.  The Evidence Shows Plaintiffs Would Suffer Irreparable Harm Unless a Temporary Restraining Order Was Issued

Defendant also argues that the Plaintiffs failed to show or allege irreparable harm. The Court already carefully reviewed all of the papers and determined that the Plaintiffs made the proper showing for the injunctive relief for which it moved.  (ECF No. 17)  Defendant simply has not read the record or reviewed all of the evidence and declarations that the Court reviewed before granting that relief.  (ECF No. 15 and 16).

Furthermore, this Court has found irreparable harm to support the issuance of a Temporary Restraining Order and a Preliminary Injunction asserting the same Lanham Act claims (passing off and trade dress infringement) asserted in the current case in factually similar

online counterfeiting cases.  Examples of such other cases include *Gorge Design Group, LLC v. Accessmall*, No. 19-1454 (W.D. Pa.) (Stickman, J.) and *Doggie Dental Inc. v. Anywill*, No. 19-682 (W.D. Pa.) (Hornak, C.J.) (TRO and Preliminary Injunction entered for passing off and trade dress claims under Lanham Act).  Similarly, this Court has also found irreparable harm in online counterfeiting cases asserting patent infringement claims.  Examples of such cases include *Airigan Solutions, LLC v. Belvia*, No. 20-284 (W.D. Pa.) (Schwab, J.) and *Doggie Dental Inc. v. Ahui*, No. 19-1627 (W.D. Pa.) (Hornak, C.J.).

### 4. The Orders and Relief Granted by the Court are have Been Approved by Countless Courts in this District and in Others

Defendant's protestations about form and procedure in this case are likely the result of no experience with the types of cases brought to the Court by Plaintiffs.  The form of the Temporary Restraining Order and the procedure in this case were previously utilized by this Court in a related case.  *Gorge Design Group, LLC v. Accessmall*, No. 19-1454 (W.D. Pa.) (Stickman, J.).  The *Accessmall* case included a *Request for Judicial Notice* [Doc. No. 7] which provided copies of Temporary Restraining Orders entered by other cases by various courts.  The language in the Temporary Restraining Order does not substantially deviate from the language or relief previously entered by this Court or other Courts.  *See Allstar Marketing Group, LLC v. *Warm Your House* Store*, No. 20-cv-8405 (S.D.N.Y. Oct. 21, 2020) ($5,000 bond for 93 sellers) (*Ference Dec.* II, Ex. 16).

Indeed, Plaintiffs' counsel and its clients have come before this Court and its brethren many times over the last two years seeking and receiving the identical relief from infringers and counterfeiters, using the same approved procedures in countless cases here and in other federal

courts.[6]  These invaluable and well-accepted procedures, including the language in the various orders are criticized in Defendant's Motion for Attorney's Fees. Before the Courts approved such procedures and Court Order, there was no way for small businesses like Plaintiffs to fight back against the scourge of counterfeiting and knock offs on online marketplaces.

Acknowledging the problem and supporting a solution, federal district courts all over the United States have approved these online anti-counterfeiting efforts. Here in our district, these efforts have thus far helped to save multiple small businesses and will save countless more from dying on the vine choked off by the proliferation of online commerce copycats and infringers.[7]

**5. All the Relief Granted and Procedures Followed were Appropriate Based upon the Facts and Law**

Plaintiffs filed this lawsuit under seal against all the Defendants. (ECF No. 1) Plaintiffs sought a Temporary Restraining Order and an Order of Court providing leave to serve the papers under an Alternative electronic service method upon confirmation that the various accounts were restrained by the third parties controlling them. (ECF Nos. 5 and 10) In Defendant

---

[6]  *See Doggie Dental, Inc. v. Anywill*, No. 19-cv-682 (W.D. Pa., August 14, 2020) [DE 91], and related cases (Hornak, C.J.); *See also Airigan Solutions, LLC v. Belvia*, No. 20-cv-284 (W.D. Pa., April 21, 2020) (Schwab, J.) [DE 34]; *Rapid Slicer LLC v. Art-House*, No. 19-411 (W.D. Pa., Jan. 9, 2020) (Horan, J.) [DE 44]; *Airigan Solutions, LLC v. Abagail*, No. 19-cv-503 (W.D. Pa., Aug 13, 2019) (Fischer, J.) [DE 52]. *See also Eye Safety Sys., Inc. v. The Partnerships and Unincorporated Ass'ns. Identified in Schedule "A"*, Case No. 18-cv-00034 [D.E. 41] (N.D. Ill. Mar. 1, 2018); *Spin Master Ltd. v. The Unincorporated P'ships and Ass'ns. Identified in Schedule "A"*, Case No. 18-cv-01270 [D.E. 39] (N.D. Ill. Apr. 25, 2018) (same); *Levi Strauss & Co. v. The Unincorporated P'ships and Ass'ns. Identified in Schedule "A"*, Case No. 17-cv-04561 [D.E. 33] (N.D. Ill. Aug. 1, 2017); *Yeti Coolers, LLC v. Taneil George*, Case No. 17-cv-62215 [D.E. 46] (S.D. Fl. Mar. 29, 2018); *Mycoskie, LLC v. csmlong188*, Case No. 17-cv-60782 [D.E. 43] (S.D. Fl. Jul. 21, 2017); *Fendi Adele, S.R.L. v. alma Hernandez*, Case No. 17-cv-62379 [D.E. 37] (S.D. Fl. Jan. 28, 2018); *Burberry Ltd. v. The Partnerships and Unincorporated Ass'ns. Identified in Schedule "A"*, Case No. 17-cv-03255 [D.E. 37] (N.D. Ill. June 7, 2017); *Louis Vutton Mallietier, S.A. v. Andrew Henry*, Case No. 17-cv-61034 [D.E. 40] (S.D. Fl. Aug. 22, 2017); *Cartier Int'l A.G. v. Anotoky*, Case No. 17-cv-60831 [D.E. 38] (S.D. Fl. Jul. 6, 2017); *Lacoste Alligator S.A. v. 6666 store*, Case No. 17-cv-60046 [D.E. 49] (S.D. Fl. Jun. 28, 2017); *Gucci Am., Inc. v. 8710 t-shirt shop*, Case No. 16-cv-63002 [D.E. 58] (S.D. Fl. Mar. 27, 2017).

[7]  *See Doggie Dental, Inc. v. Anywill*, No. 19-cv-682 (W.D. Pa., August 14, 2020) [DE 91], and related cases (Hornak, C.J.); *See also Airigan Solutions, LLC v. Belvia*, No. 20-cv-284 (W.D. Pa., April 21, 2020) (Schwab, J.) [DE 34]; *Rapid Slicer LLC v. Art-House*, No. 19-411 (W.D. Pa., Jan. 9, 2020) (Horan, J.) [DE 44]; *Airigan Solutions, LLC v. Abagail*, No. 19-cv-503 (W.D. Pa., Aug 13, 2019) (Fischer, J.)) [DE 52].

MercadoMagico's case, the restraint confirmation was provided by PayPal. (*See* Declaration of Brian Samuel Malkin, filed herewith ("*Malkin Dec II*") ¶ 10. The account restrained, per Court Order, was the account that Plaintiffs paid into when ordering the fake product sold by MercadoMagico. (*Id.* at 9) Upon confirmation that the restraints were placed by all Financial Institutions, Plaintiffs immediately served the Complaint, Summons, and Notice of Show Cause Hearing.  (*Id.* at 11).  Defendant MercadoMagico had notice of this action since September 23, 2020, when PayPal informed Defendant MercadoMagico of this lawsuit and provided contact information for Plaintiffs' counsel.  Despite knowing about this lawsuit for twelve (12) days before the hearing on October 5, 2020, Defendant MercadoMagico nor its counsel ever contacted Plaintiffs' counsel.  (*Id. at ¶ 22*)

Defendant also argues that the temporary restraining order was overreaching and that the security was insufficient. This form of temporary restraining order and the amount of security has been reviewed and approved by this Court and its brethren many times before. It has also been approved in other jurisdictions where hundreds of online anti-counterfeiting cases are handled each year. *See* fn. 4, *supra. See also Airigan Solutions v. Belvia*, Civil Action No. 20-284 (W.D. Pa.) (Order of Judge Schwab lowering security amount from $250,000.00 to $5,000.00 after motion and briefing, filed March 2, 2020) (ECF No. 18) and *Talisman Designs, LLC v Dasani*, Civil Action No. 20-1084 (W.D. Pa.) (Text Order of Judge Schwab issued *sua sponte* lowering security amount from $250,000.00 to $5,000.00, filed July 22, 2020) (ECF No. 20). Further, at no time was Defendant MercadoMagico's storefront shut down under the Court's Order.  (*Malkin Dec II*, ¶¶ 13 - 14)  Of course, Defendant MercadoMagico was free to seek relief from the asset freeze as has been done in other cases.  *See Volkswagen AG v. DXZ Official Store*, No. 18-cv-6611 (N.D. Ill.).

The Defendant complains of "delayed service" as if it was a deliberate act by Plaintiffs. In reality, service was accomplished as soon as the restraints on Defendant's account were confirmed by PayPal. (*Malkin Dec II*, ¶¶ 9 - 12).  Here, Shopify, Inc., did not respond until September 29, 2020.  (*Id.*)  Once the confirmation was received, Plaintiffs served all the Defendants. (*Id.*)  Defendant never once reached out to Plaintiffs' counsel to discuss an extension or rescheduling of the show cause hearing (which is quite common in this district) before filing multiple extensive motions. (*Id.* at ¶¶ 15 - 18).  Moreover, Defendant's own evidence (*Peterson Dec.*, Exhibit 1, DE 44-1) clearly indicates that it was on notice of the lawsuit on the morning of September 23, 2020 – the date that PayPal notified Defendant of the lawsuit, Court, docket number, and Plaintiffs' counsel and contact information. [ECF No. 44-1]. Plaintiffs' counsel initiated all the contacts in this case leading up to the show cause hearing.  (*See Malkin Dec. II* at ¶ 22)  During telephone calls with Defendant's counsel on October 2, 3, and 4, all initiated by Plaintiff's counsel, Defendant's counsel refused to discuss anything other than a demand to be dismissed from the case and for Plaintiffs to pay all costs. (*Id.*)

In its grab bag of issues, Defendant also picks at the Complaint language though Defendant is not a party to the lawsuit.  Defendant complains about the form of the summons though the form is requested by the Clerk of Courts and not Plaintiffs. (*Malkin Dec II*, ¶¶ 6 - 8 ). Defendant accuses the Plaintiffs of "extortive settlement tactics" and excludes important aspects of communications for settlement purposes, which Plaintiffs will not reveal here.[8] Part of resolving any online brand protection case is discussing with the Defendant the number of sales,

---

[8]   Contrary to Defendant's assertions of "extortive settlement tactics" in its motion, this district does not take such unfair competition lightly. The use of another plaintiff's photographs to sell knock offs into this district has resulted in final judgments awarded of $2,000,000.00 or more for disgorgement of profits under Section 43 (a) unfair competition claims. See *Doggie Dental, Inc. v. Anywill*, No. 19-cv-682 (W.D. Pa., August 14, 2020) [DE 91], and related cases (Hornak, C.J.) Indeed, selling just one product is sufficient for damages to attach. It follows that settling such cases is more desirable than letting them go to judgment.

revenue generated, profit received, number of outlets, source of infringing goods, and

mechanisms and timing for releasing the restraints on the Defendant's accounts. (*Id.* at ¶¶ 20 -

22) Defendant never provided Plaintiffs with any information indicating the source of

Defendant's infringing goods nor how many of the goods it sold in total. (*Id.*)

### B.  Service, Jurisdiction, Venue, and Joinder are Appropriate

Undeterred by the controlling law, Defendant MercadoMagico attempts to make its case

by second guessing the Court and questioning the thoroughness in which all the procedure and

evidence was reviewed by the Court before any relief was granted to the Plaintiffs in this case.

Despite its complaints here, there is no doubt that Defendant had proper service and notice of the

Show Cause Hearing.[9]  Fed. R. Civ. P. 65 (a)(1) requires merely that the adverse party

(MercadoMagico) have notice of the hearing – service is not a prerequisite as argued by

Defendant here. Regardless, Defendant had notice of the show cause hearing as it hired

Defendant's Counsel, and proceeded to file multiple motions and appeared in Court.

Continuing its broadside, Defendant MercadoMagico asserts that it is not subject to

personal jurisdiction in the Western District of Pennsylvania.  The recent decision of Judge

Schwab in an online counterfeiting case denying a motion to set aside the Clerk's entry of default

on the basis of lack of personal jurisdiction is instructive in this regard.  *Talisman Designs, LLC*

*v. Dasani*, No. 20-cv-1084 (W.D. Pa. Oct. 13, 2020) [Doc. No. 58].  In finding lack of personal

jurisdiction was not a meritorious defense, Judge Schwab quoted approvingly from a recent

decision in the Northern District of Illinois after noting the standard for personal jurisdiction is

the same in Pennsylvania and Illinois:

---

[9]      As evidenced by Defendants' multiple motions filed before the show cause hearing. *See also Talisman Designs v. Dasani*, et al, Civil Action No. 20-1084 (W.D. Pa.), Schwab J. (Order denying motion to set aside default, alleging in part improper electronic service, filed on October 13, 2020) (ECF No. 58)

With regard to personal jurisdiction, the record reflects that each of these two defendants operates an interactive website through which it offered products for sale that consumers in Illinois who have selected an address for shipping including to Illinois is an option.  It's less significant that any products were actually sold to Illinois than products were offered for sale in Illinois which the record reflects they were.  So for this reason and the language of certain Supreme Court cases, the defendants purposely availed themselves of the privilege of doing business in Illinois.  It's also sufficient under Illinois law which allows the exercise of personal jurisdiction up to the limits of due process.

*Id.* at 6.  In the present case, the evidence shows that not only did Defendant MercadoMagico offer products for sale to consumers in Pennsylvania, it actually sold product into this Judicial District.  Thus, Defendant MercadoMagico is subject to personal jurisdiction.

Defendant MercadoMagico also alleges that Plaintiffs brought this action knowing that venue was improper for a patent infringement claim.  In the present case, there are multiple claims – including claims under both the Lanham Act for Section 43 (a) unfair competition and the Patent Act.  This Court, however, has had other cases with both Lanham Act and Patent Act claims.  *Gorge Design Group, LLC v. Accessmall*, No. 19-1454 (W.D. Pa.) (Stickman, J.) and *Airigan Solutions, LLC v. Abagail*, No. 19-503 (W.D. Pa.) (Fischer, J.).  Furthermore, in a similar case with claims under both the Lanham Act and Patent Act, when the defendant contested venue on the patent claim, the Southern District of New York held that venue was proper for the patent claim under the doctrine of pendent venue given the Lanham Act claim was the primary claim.  *Hsin Ten Enter. United States v. Clark Enters*., 138 F. Supp. 2d 449, 462-463 (S.D.N.Y. Dec. 28, 2000).

Defendant MercadoMagico also alleges that Plaintiffs brought this action knowing that joinder was improper.  Defendant MercadoMagico, however, has failed to identify any online counterfeiting case where a court has found joinder to be improper.  Defendant MercadoMagico ignores that this Court has previously found in multiple online counterfeiting cases that joinder is

appropriate.  Defendant MercadoMagico, however, contends that Plaintiffs made false statements and submitted a false affidavit about the activities of Defendant MercadoMagico and its cooperative efforts with other Defendants to support joinder.  The evidence, however, shows that Defendant MercadoMagico, whether a U.S –based seller or foreign-based, behaved like all the other defendants in the case, including offering to sell and selling cheap foreign made copies of Plaintiffs' authentic product.  Plaintiffs had a good faith reason to conclude that Defendant MercadoMagico was cooperating and coordinating its efforts with the other defendants selling cheap foreign made copies. Plaintiffs have experience with manufacturers, distributors, and sellers (like Defendant MercadoMagico) all working in coordination to create an illegal and damaging parallel competing market.  *See* ECF No. 26 (Notice of Publicity of Lawsuit in China by Defendants, indicating the communication and coordination of the sellers of the infringing products in this case) and *See Erdely Dec. II*, ¶ 8 - 12.

Joinder of the defendants is proper when plaintiffs seeks relief "jointly, severally, or in the alternative with respect to arising out of the same transaction, occurrence or series of transactions or occurrences;" and "any question of law or fact common to all defendants will arise in the action."  Fed. R. Civ. P. 20(a)(2).  Joinder is consistent with the strongly encouraged policy of "entertaining the broadest possible scope of action consistent with fairness to the parties."  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715. 724 (1966).  In a recent decision on joiner in an online counterfeiting case, the Northern District of Illinois found joinder was appropriate, stating:

> According to the Merriam-Webster dictionary, "transaction" generally involves a "reciprocal[] affect" or "exchange," whereas an "occurrence" is defined as something that simply "happens" or "appears."  Unlike a "transaction," an "occurrence" is not necessarily the product of joint or coordinated action.

The internet frequently produces occurrences that can be described as cooperative but not transactional or intentionally coordinated. Individual actions which alone may have minimal impact on society or the economy can have a substantial impact through aggregation that is only possible through the internet. Individuals on the internet can openly reach billions of people with a single click of a mouse, while at the same time hiding their identities, frustrating law enforcement. As a result, an "occurrence" of mass harm easily can be inflicted even if there is no express "transactional" coordination among the attackers.

Rule 20's inclusion of the term "occurrence" should allow plaintiffs to join in a single case the defendants who participate in such unlawful occurrences, despite the lack of a "transactional link." The kind of harmful occurrences the internet enables — including mass foreign counterfeiting — were inconceivable when Rule 20 was drafted. But the Rule's inclusion of the term "occurrence" suggests that joinder is appropriate in cases alleging harm that is not strictly "transactional."

*Bose Corp. v. The Partnerships and Unincorporated Associations Identified on Schedule "A"*, 334 F.R.D. 511, 517 (N.D. Ill. 2020) (Durkin, J.). For at least these reasons, the Defendants are properly joined in this case.

### C. There is no Legal Basis to Impose Attorney's Fees, Costs, or Sanctions on Plaintiffs Because Defendant was Voluntarily Dismissed from the Case Under Rule 41 and is not a Prevailing Party

There is no legal basis to impose attorney's fees or sanctions on Plaintiffs because Defendant is not a "prevailing party" under any scenario. Accordingly, the theories that Defendant argued for that require a "prevailing party" are not applicable here (i.e., Rule 54, 35 U.S.C. § 285 (Patent Act), 15 U.S.C. § 1117 (Lanham Act), and 17 U.S.C. § 505 (Copyright Act)). The Copyright Act does not even apply in this case; there is no Count or claim for damages under the Copyright Act and jurisdiction under the Copyright is not alleged. Simply put, the Defendant is not before the Court under the Copyright Act and this case cannot be exceptional in that regard. Whether or not a case is "exceptional" under the Lanham Act or Patent Act is immaterial if there is no "prevailing party."

Once a voluntary dismissal is filed, the dismissed defendant is not a party in the case.  It is notable that Defendant MercadoMagico has not and cannot cite a single case where it would be considered a prevailing party and even concedes that in its papers ("the touchstone of the prevailing party inquiry must be the material alteration of the legal relationship of the parties. This change must be marked by judicial i*mprimatur*.") (*Defendant's Memorandum*, p. 20, lines 4 – 8) (citations omitted).  There is no judicial action involved in the voluntary dismissal of the Defendant in this case and thus there is no judicial *imprimatur*.

The law is clear in the Third Circuit in this regard, a notice of voluntary dismissal under Rule 41 is not a motion and absent the Defendant filing an Answer or a Motion for Summary Judgment, requires no Court action.  See *In re Bath & Kitchen Fixtures Antitrust Litig*., 535 F.3d 161 (3d Cir. 2008). The 3rd Circuit explained Rule 41: "First, a filing under the Rule is a notice, not a motion. Its effect is automatic: the defendant does not file a response, and no order of the district court is needed to end the action. Second, the notice results in a dismissal without prejudice (unless it states otherwise), as long as the plaintiff has never dismissed an action based on or including the same claim in a prior case. Third, the defendant has only two options for cutting off the plaintiff's right to end the case by notice: serving on the plaintiff an answer or a motion for summary judgment." *In re Bath & Kitchen Fixtures Antitrust Litig*., 535 F.3d 161, 165 - 66 (3d Cir. 2008).  *See also Hammill v. Bank of Am., N.A.*, Civil Action No. 12-0117 Erie, 2013 U.S. Dist. LEXIS 123427, at *10-*11 (W.D. Pa. Aug. 29, 2013) (In a mortgage dispute, a bank voluntarily dismissed its foreclosure action. The Court found the homeowners were not a "prevailing party," and said the meaning of "prevailing party" must be strictly construed).  An illustrative patent case is *RFR Indus. Inc. v. Century Steps, Inc.*, 477 F.3d 1348 (Fed. Cir. 2007), in which the Federal Circuit reversed an award of attorney fees to the defendant under 35 U.S.C.

285 because the patentee had dismissed its infringement suit without prejudice under FRCP

41(a)(1)(i) – as Defendant MercadoMagico was dismissed.

Despite the dismissal here, it is crystal clear that Plaintiffs had a good faith basis for

filing and bringing all the claims before the Court.  So, even if the Defendant was not dismissed

from the case, there would be no basis to claim attorney's fees against the Plaintiffs.

### D. Defendant's Remaining Attorney's Fees Theories are also Not Applicable Here Because There is No Evidence that Plaintiffs Behaved Unethically or Violated Any Court Rule nor Made a Baseless Filing

Finally, Defendant MercadoMagico accuses Plaintiffs' counsel of Rule 11 violations,

invokes the Court's Inherent Powers, and argues under both Federal (28 U. S. C. § 1927)

(sanctions for multiplying proceedings unreasonably) and Pennsylvania law (42 Pa. C.S.A. §

2503) that Plaintiffs' filings are vexatious and sanctionable.  Defendant even claims that

Plaintiffs violated the Professional Code of Conduct.  None of Defendant's claims are supported

by the facts or law and should be denied by this Court.

### 1.  Sanctions Under Rule 11 and Rule 3.3 Are Not Permitted

Defendant MercadoMagico has not complied with either the safe harbor provision of

Rule 11 or the requirement a motion for Rule 11 sanctions be filed separately from all other

motions. "A motion for sanctions must be made separately from any other motion and must

describe the specific conduct that allegedly violates Rule 11(b)."  Here, the Defendant simply

lumps its Rule 11 Motion together with the rest of its arguments seeking attorney's fees. The

motion must be served under Rule 5, but it must not be filed or be presented to the court if the

challenged paper, claim, defense, contention, or denial is ***withdrawn*** or appropriately corrected

within 21 days after service or within another time the court sets.  If warranted, the court may

award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion." Rule 11(c)(2).

The 3rd Circuit has found the requirement for 21 days is not waivable. "If the twenty-one day period is not provided, the motion must be denied." *In re Schaefer Salt Recovery, Inc*., 542 F.3d 90, 99 (3rd Cir. 2008). See also *Knoll v. City of Allentown*, 707 F.3d 406, 408 (3d Cir. 2013)( District Court noted that it believed Knoll's motions were frivolous but declined to order sanctions both because Allentown did not comply with Rule 11's safe harbor provision, *see* Fed. R. Civ. P. 11(c)(2), and because it was not convinced that Knoll's conduct was sanctionable under the law of this Court); *Metro. Life Ins. Co. v. Kalenevitch*, 502 F. App'x 123, 124-25 (NONPRECENTIAL OPINION) (3d Cir. 2012) (The Court denied the Rule 11 motion for failure to comply with the requirement of service the motion separately and waiting 21 days to file it).[10] Therefore, under Third Circuit law, Defendant MercadoMagico's Rule 11 Motion violates Rule 11 and must be denied.

Even if the Court were to find that the Defendant met the timing requirements of Rule, the Third Circuit has interpreted the language of Rule 11 to prescribe sanctions only in exceptional circumstances where a claim or motion is patently unmeritorious or frivolous. *Mellon Bank, N.A. v. Deluxe Data Sys.*, Civil Action No. 95-1768, 1997 U.S. Dist. LEXIS 21979, at *4 (W.D. Pa. June 27, 1997). "Rule 11 sanctions are appropriate regarding the initiation of a lawsuit only if the filing of the complaint constituted abusive litigation or misuse

---

[10]   *See also Gym Door Repairs, Inc. v. Young Equip. Sales, Inc*., 2020 U.S. Dist. LEXIS 15010, *15 (S.D.N.Y. January 28, 2020)(district court denied a Rule 11 motion because the Plaintiffs moved for sanctions under both Rule 37 and Rule 11 in the same motion.); *Radcliffe v. Rainbow Constr. Co.*, 254 F. 3d 772, 789 (9th Cir. 2001) (The Ninth Circuit held "although a defendant had given informal warnings to the plaintiffs threatening to seek Rule 11 sanctions, these warnings did not satisfy the strict requirement that a motion be *served* on the opposing party twenty-one days prior to filing.").  There, the 9th Circuit reversed an award of sanctions because the defendant failed to comply with the safe harbor provision of Rule 11, and held it was improper for the court to convert the motion to a court initiated motion. *Id*.

of the court's process." *Teamsters Local Union No. 430 v. Cement Express, Inc.*, 841 F.2d 66, 68 (3d Cir. 1988).

In *Berry v. ADT Sec. Servs.*, No. 4:19-024, 2019 U.S. Dist. LEXIS 131273, at *6-7 (S.D. Tex. Aug. 6, 2019), the district court recognized that even if it were inclined to impose sanctions *sua sponte*, it does not have the authority to impose the attorney's fees sanctions after a defendant was voluntarily dismissed.  Rule 11(c)(5)(B) prohibits courts from imposing monetary sanctions after a voluntary dismissal unless the court has issued a show cause order *before* the dismissal. *See* Fed. R. Civ. P. 11(c)(5)(B).  Thus, even if the court were inclined to issue *sua sponte* sanctions in this case, it could only issue nonmonetary sanctions, which Defendants have not requested.  *See Dunster Live, LLC v. Lonestar Logos Mgmt. Co.*, No. A-16-CV-968-LY-ML, 2017 U.S. Dist. LEXIS 226579, at *15 (W.D. Tex. Aug. 8, 2017).  *See also Marlin v. Moody Nat'l Bank N A*, 533 F.3d 374, 379 (5th Cir. 2008) (absent a show cause order, issued before the voluntary dismissal, the district court may not award sanctions under Rule 11(b)).

Rule 3.3 of the Rules of Professional Conduct does not provide authority for an award of sanctions.  Plaintiffs' counsel has only been able to find one case in which a violation of Rule 3.3 was found to be a basis to award a sanction -- under FRCP 16(f) -- and bad faith was required. *See Pennsylvania Envtl. Defense Found. V. United States Dep't of the Navy*, No. 94-1486, 1995 U.S. Dist. LEXIS 1461 (E.D. Pa. 1995) (court found violation of Rule 3.3 and imposed a sanction under FRCP 16(f) where attorney requested a pretrial conference be rescheduled because of "some unspecified emergency" instead of disclosing counsel had a scheduled fishing trip).  In the present case, neither Plaintiffs nor their counsel have acted in bad faith.

### 2. Sanctions Under 42 Pa. C. S. § 2503, 28 U.S.C. § 1927, the Court's Inherent Authority Are Not Appropriate Because Plaintiffs Have Not Acted in Bad Faith

Sanctions under 42 Pa. C. S. § 2503, 28 U.S.C. § 1927, or the court's inherent authority require a finding of bad faith.  See *Thunberg v. Strause*, 682 A.2d 295, 299-300 (Pa. 1996); *In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*, 278 F.3d 175, 181 (3d Cir. 2002), discussing bad faith, the court held "an opponent can be charged with filing a lawsuit in 'bad faith' if he filed the suit for purposes of fraud, dishonesty, or corruption." (Internal Citations Omitted).  *Thunberg v. Strause*, 682 at 299-300.

"[A]n award of fees and costs pursuant to the court's inherent authority to control litigation will usually require a finding of bad faith."  *In re Prudential Ins. Co. Am. Sales Practice Litig. Actions*, 278 F.3d 175, 181 (3d Cir. 2002).  "Imposing sanctions under 28 U.S.C.S. § 1927 requires a finding of bad faith, while doing so under Fed. R. Civ. P. 11 requires a showing of objectively unreasonable conduct."  *Morning Sun Books, Inc. v. Div. Point Models, Inc.*, No. 18-3510, 2020 U.S. App. LEXIS 29448, at *1 (3d Cir. Sep. 16, 2020).  "Generally, a court's inherent power should be reserved for those cases in which the conduct of a party or an attorney is egregious and no other basis for sanctions exist." *United States v. Jones*, 505 Fed. Appx. 192, 194 (3d Cir. 2012).  The Supreme Court has cautioned that because of the 'very potency' of a court's inherent power, it should be exercised 'with restraint and discretion.'" *United States v. Int'l Bhd. of Teamsters*, 948 F.2d 1338 (2d Cir. 1991) (internal citation omitted).

"Attorney's fees under section 1927 are caused by unjustified failure to comply with discovery orders or pretrial orders."  *Connor v. Corp. Life Consultants*, No. 06-2831, 2006 U.S. Dist. LEXIS 71392, at *5 (E.D. Pa. Sep. 29, 2006).  "Before the Court may order payment of attorneys' fees under section 1927, it must find willful bad faith on the part of the offending

attorney." *Id.*  In *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1382 (Fed. Cir. 2005), the Federal Circuit held "because the section authorizes sanctions only for the 'multiplication of proceedings,' it applies only to unnecessary filings and tactics ***once a lawsuit has begun."*** (emphasis added by the court).  Thus, the adequacy of MEMC's pre-filing investigation is irrelevant to the section 1927 inquiry." (Internal Citations Omitted).  *Id.*

Since there is no factual or legal basis to find that Plaintiffs' filings violate any of the standards set forth in these additional cited authorities, Defendant MercadoMagico's should not be awarded attorney's fees and costs.

## IV. CONCLUSION

Defendant MercadoMagico, like the other Defendants in this case, did exactly what Plaintiffs allege Defendant MercadoMagico did.  The evidence submitted by Plaintiffs at the time this lawsuit was filed demonstrated that 1) Defendant MercadoMagico used fifteen (15) of Plaintiffs' photographs to advertise and offer for sale a cheap knock-off of Plaintiffs' ULTIMATE GROUND ANCHOR product, thereby creating a likelihood that consumers would think Defendant MercadoMagico's cheap knock-off product was Plaintiffs' ULTIMATE GROUND ANCHOR product, and 2) the cheap knock-off offered for sale by Defendant MercadoMagico infringed Plaintiffs' patent.  Despite over 2,500 online counterfeiting cases that have been filed in this Court and other jurisdictions – and which have been brought and litigated in the same way as this case – Defendant MercadoMagico has not cited one case in which attorney fees have been awarded to a defendant.  Simply stated, Defendant MercadoMagico has not shown – and cannot show – that Plaintiffs acted in bad faith in bringing this lawsuit against

Defendant MercadoMagico.  Defendant MercadoMagico's motion for attorney's fees and costs should be denied. A proposed order denying Defendant's motion is submitted herewith.

Respectfully submitted,

Dated:  November 5, 2020

/s/ Stanley D. Ference III
Stanley D. Ference III
Pa. ID No. 59899
courts@ferencelaw.com

Brian Samuel Malkin
Pa. ID No. 70448
bmalkin@ferencelaw.com

FERENCE & ASSOCIATES LLC
409 Broad Street
Pittsburgh, Pennsylvania 15143
(412) 741-8400 – Telephone
(412) 741-9292 – Facsimile

Attorneys for Plaintiffs